UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| NEW YORK LIFE INSURANCE CO., | ) ) | |
| Plaintiff, | ) ) | No. 5:15-CV-353-HAI |
| v. | ) ) | MEMORANDUM OPINION AND |
| JANE-ANN HUNSAKER TERRY and EVA CAROLE TERRY WUEST, | ) ) ) | ORDER |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Tim Terry died in September 2015. Days before his death he changed the beneficiary of his life insurance policy from his wife to his sister. Terry's wife had paid all the policy premiums, but had filed for divorce. His sister housed him during the final month of his life. Both claimed the proceeds.

In December 2015, New York Life Insurance Company ("NY Life") filed this action in interpleader, asking the Court to determine the proper beneficiary. *See* D.E. 13 (Second Amended Complaint). The parties consented to jurisdiction by a Magistrate Judge (D.E. 21), and the case was later assigned to the undersigned.

On August 22, 2016, Plaintiff NY Life filed a motion to be dismissed from the case with prejudice once the proceeds were deposited with the Court. D.E. 44. The motion also sought to enjoin the other parties from commencing any action against NY Life and for an award of attorneys' fees and expenses. *Id.*

On September 20, 2016, Defendant/Cross-Claimant Eva Carole Terry Wuest ("Sister") moved for summary judgment.  D.E. 47.  On October 14, 2016, Defendant/Cross-Claimant Jane-Ann Hunsaker Terry ("Wife") also moved for summary judgment.  D.E. 58.  All three motions are fully briefed.

Federal Rule of Civil Procedure 56 requires a court to grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must assume the truth of the non-moving party's evidence, and draw all inferences in a light most favorable to the non-moving party.  *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If there is sufficient evidence for a trier of fact to find for the non-moving party, a genuine dispute of material fact exists and summary judgment may not issue.  *Mullins*, 805 F.3d at 765.  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).

Courts normally conduct interpleader actions in two stages.  The first stage involves determining whether interpleader is appropriate and relieving the plaintiff from liability.  The second stage adjudicates the claims of the defendant claimants.  *United States v. High Tech. Prod., Inc.*, 497 F.3d 637, 641 (6th Cir. 2007).  But "bifurcation is not mandatory" and "the entire action may be disposed of at one time."  *N.Y. Life Ins. Co. v. Connecticut Dev. Auth.*, 700 F.2d 91, 95 (2d Cir. 1983); *see Confederation Life Ins. & Annuity Co. v. Gallion*, No. 5:12-CV-177-DCR, 2013 WL 6061809, at *1 (E.D. Ky. Nov. 18, 2013) (performing both stages in a single order).

## I.  Factual Background

Terry and Wife married in 1988.  D.E. 54 at 8.  They had two sons who are now in their twenties.  D.E. 58-2 at 1.  In 2006 Terry left his job due to back pain from degenerative disc disease.  D.E. 54 at 17.  From that point, the family's sole income derived from Wife's family business and investments.  D.E. 58-2 at 1-2.  When he left his job, Terry lost his employee-provided life insurance.  *Id*. at 1.  That same year, Terry and Wife decided to obtain a $200,000 whole life insurance policy from NY Life.  In her deposition, Wife described how she and Terry agreed that payments for policy premiums would come from their joint checking account and she would be the named beneficiary:

> Wife:   We discussed getting life insurance, because he no longer was working at Dick's Sporting Goods.  So we had a policy drawn up, discussed that I would be the beneficiary.  This was done to be set up for our children, who were young at that age, elementary and junior high age.  This was something for them.  And I would be named beneficiary for them.
>
> . . . .
>
> Q:      . . . What was your agreement with Tim Terry?
>
> A:      That the life insurance policy would be drawn and I would be the beneficiary.  But the policy—in the time—if anything happened to him, this money would be for his children and his children only.
>
> Q:      Okay.  Anything else in the agreement?
>
> A:      And that I would pay for the policy myself out of my income.

D.E. 54 at 18-19.

In 2010, Terry suffered a motorcycle accident.  According to Wife, he became addicted to painkillers.  He also drank and was sometimes abusive.  D.E. 58-2 at 3-4.  In summer 2015, Wife filed for divorce, hiring attorneys Valerie Kershaw and Mindy Seagraves to represent her.

*Id*. at 4.  Terry hired Michael Paul Rowland to represent him in the divorce proceedings.  D.E. 53 at 9.

Terry moved out on August 1, 2015.  D.E. 54 at 12; D.E. 58-2 at 4.  Wife allowed him to take $15,000 from the joint account to cover his living expenses.  Terry also sold some personal items to a jewelry store, without Wife's permission.  D.E. 58-2 at 4.  Terry opened his own separate bank account.  *Id*.

The parties agreed to an order in the divorce case that Terry could not enter the family's property or their horse-boarding farm without prior written permission, and that Terry would remain 500 feet away from Wife.  D.E. 53 at 109-10.  No "Status Quo" order was entered in the divorce case.  D.E. 62 at 15.  Such an order would almost certainly have required that Terry not change his life insurance beneficiary.  D.E. 55 at 4.  Instead, Rowland counseled Terry not to "cash it in or cancel anything right now."  D.E. 53 at 25.  Rowland could not specifically recall counselling Terry against changing the beneficiary.  *Id*. at 26.

On August 28, 2015, Terry contacted NY Life insurance agent Andrew Caudill.  D.E. 52 at 7.  Terry wanted to change the automatically drafted premium payments so that they came from his new bank account, rather than Wife's.  *Id*. at 7-8, 14.

On September 1, Terry and Caudill met in person.  During the meeting, Caudill informed Terry of his various rights, including his right to change the beneficiary.  *Id*. at 9, 44, 49.  According to Caudill, it was during that meeting that Terry decided to change the beneficiary from Wife to Sister.  *Id*. at 21.  Caudill testified that Terry felt scorned, hurt, and bitter about the impending divorce and how he had even "lost" his children.  *Id*. at 15.  But Terry was "lucid" during the meeting and did not appear impaired.  *Id*. at 16.  He "very much appeared" to Caudill to be "on top of his game" during phone conversations and the face-to-face meeting.  *Id*.

4

Regarding Sister, Terry told Caudill, "I don't know what I would do without her. She's always been there for me and took me in." *Id*. at 20. Terry did not appear to be under pressure from anyone else to make the beneficiary change. *Id*. at 25-26. Caudill believed that Terry's sense that Wife betrayed him was what motivated him to make the change. *Id*. at 26.

On September 5, 2015, Sister arrived home shortly after 11:00 p.m. and found Terry lying lifeless in his bedroom. D.E. 51 at 37. The coroner pronounced him dead after midnight, rendering September 6 his official date of death. D.E. 58-2 at 5. The Certificate of Death listed the manner of death as suicide, the cause of death multiple drug intoxication. D.E. 1-3 (death certificate). Sister believes the overdose was accidental. D.E. 51 at 40.

Neither Wife nor Sister knew about the beneficiary change until after Terry passed away. D.E. 51 at 29; D.E. 52 at 29; D.E. 58-2 at 5. Sister denies that she suggested the beneficiary change to Terry. D.E. 51 at 29.

## II. NY Life's Motion to Dismiss

NY Life moves for an order:

(i) permitting the Company to interplead a death benefit of $200,000, plus applicable claim interest, if any, which became payable to a beneficiary or beneficiaries as a result of the death of Timothy W. Terry; (ii) dismissing the Company from this action with prejudice following the deposit of the death benefits with the Clerk of the Court; (iii) permanently enjoining any of the parties to this action from commencing any other actions or proceedings seeking payment of the death benefits or otherwise in connection with the insurance coverage at issue; and (iv) awarding the Company its attorneys' fees and costs.

D.E. 44 at 1.

Wife and Sister are comfortable with NY Life being dismissed once it deposits the insurance proceeds with the Court. D.E. 45 at 2; D.E. 46 at 2. In an interpleader action, absent "bad faith on the part of the stakeholder or the possibility that the stakeholder is independently

liable, discharge should be readily granted." *Sun Life Assur. Co. of Canada v. Thomas*, 735 F. Supp. 730, 733 (W.D. Mich. 1990) (citing *N.Y. Life Ins. Co. v. Connecticut Dev. Auth.*, 700 F.2d 91, 96 (2d Cir. 1983)).  Thus, once the amount to be deposited is calculated and actually deposited, discharge will be appropriate.

The parties agree that the principal amount of the death benefit is $205,119.39.  D.E. 49 at 2; D.E. 60 at 1.

### A.  Interest Rate

NY Life asserts that the applicable interest rate is 3.5%, but Wife and Sister take issue with this figure.  The question of the interest rate first emerged in Wife's response brief, which assumed a rate of 8%.  D.E. 46 at 7.  NY Life replied that, "Pursuant to the Policy, the Company sets the interest rate that will be applied to the Policy, if any.  As of September 12, 2016, the interest rate for the Policy was 3.5%, which rate could fluctuate depending on when the Policy Death Benefit is deposited with the Court's Registry."  D.E. 48 at 1 n.1.

Wife argues that the interest rate should be calculated according to Ky. Rev. Stat. Ann. § 360.010 (LexisNexis 2008), which states that "[t]he legal rate of interest is eight percent (8%) per annum."  D.E. 46 at 4.  That statute also provides that parties may contractually agree to a different rate and "any party or parties who may assume or guarantee any such contract or obligation, shall be bound for such rate of interest as is expressed in any such contract."  Ky. Rev. Stat. Ann. § 360.010.  NY Life argues that § 360.010 applies only to negotiated bank loans. D.E. 49 at 3; D.E. 59 at 2.  This is not correct.  "Absent a contractually agreed upon rate, the appropriate rate of interest is governed by [KRS § 360.010]."  *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 857 (Ky. Ct. App. 2003).  Although one subsection of the

statute applies to negotiated bank loans, Kentucky generally applies the 8% rate in other contexts.

The question then is whether the policy sets an interest rate that displaces the default 8% rate established by statute. *See Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 447 (6th Cir. 2014), *as amended* (Dec. 11, 2014) (quoting *Reliable Mech.*, 125 S.W.3d at 857); *Concrete Materials Corp. v. C.J. Mahan Const. Co.*, 110 F.3d 63 (6th Cir. 1997) (applying a contractual interest rate of 2% rather than the rate set by § 360.010); *Forcht Bank, NA v. Gribbins*, No. 2014-CA-592-MR, 2015 WL 4039612, at *4 (Ky. Ct. App. July 2, 2015) ("[W]hen no agreement exists as to the appropriate rate of interest, KRS 360.010 provides that the legal rate of interest is eight percent."); D.E. 60 at 2-3.

NY Life argues that the policy establishes that the prejudgment interest rate would be set by the company, and that the company's current rate is 3.5%. D.E. 59 at 2. Imposing 8% interest, the company argues, would be unduly punitive and would create an unfair windfall for the beneficiary. *Id*. at 2-3.

In this case, the contract controls the interest rate. The policy makes no explicit reference to a 3.5% interest rate. *See* D.E. 50-1 (policy documents). However, section 1.1 states that NY Life

> will pay the life insurance proceeds to the beneficiary promptly when we have proof that the Insured died on or after the Effective Date of this policy, subject to all of this policy's provisions. We will pay the life insurance proceeds in accordance with the policy proceeds option chosen. These proceeds bear interest compounded each year from the Insured's death to the date of payment. **We set the interest rate each year. This rate will not be less than the rate required by law.**

D.E. 50-1 at 12 (emphasis added). Section 6.1 also concerns the payment of policy proceeds. It states that "[a]ny life insurance proceeds paid in one sum will bear interest compounded each

year from the Insured's death to the date of payment.  This rate will not be less than required by law."  D.E. 50-1 at 18.  These appear to be the operative provisions, and the parties do not point to any other provision as controlling.[1]

Wife argues that these provisions incorporate § 360.010, and that 8% is therefore the rate "required by law" that NY Life must meet or exceed.  D.E. 60 at 3.  Wife further argues that any ambiguity on this point should be construed against NY Life, as drafter of the policy.  *Id*. at 4.

However, the policy is not ambiguous.  Section 1.1 states that policy proceeds will be paid along with compound interest, *the rate of which will be set by the company each year*.  D.E. 50-1 at 12.  The Court finds that, for purposes of KRS § 360.010, there was a binding written agreement between the parties allowing NY Life to set a non-statutory rate of interest, even though the contract recognized that the rate would fluctuate.  It is only in the "absen[ce]" of "a contractually agreed upon rate" that KRS § 360.010 mandates the application of 8% interest. *Reliable Mech.*, 125 S.W.3d at 857.

Further, contrary to Wife's argument, NY Life's current rate of 3.5% is not "less than the rate required by law," as forbidden by sections 1.1 and 6.1 of the policy.  The parties do not point to any Kentucky law requiring life insurance policies or any other contracts to include a minimum interest rate.  Accordingly, the policy language agreed to by the parties controls: "We set the interest rate each year."  D.E. 50-1 at 12.  NY Life should deposit the policy proceeds with the Court, along with annual compound interest at the rate which is set by the company as of the date of this order.  However, because NY Life's assertion that the most recent rate is 3.5%

---

[1] Section 6.7 provides that the policy proceeds may be left with the company (instead of paid out immediately) to accrue interest.  Regarding this type of interest, "We will set the interest rate each year.  The rate will not be less than the rate required by law."  D.E. 50-1 at 18.

8

is not supported by any evidence in the record, further proceedings for the Court to find the applicable rate are necessary and are explained below.

## B.  Permanent Injunction

Wife opposes NY Life's request for a permanent injunction barring Defendants from pursuing any additional litigation against NY Life regarding the policy.   D.E. 46 at 2-3. However, such an injunction is entirely appropriate in this case.

"Interpleader is a procedural device which entitles a person holding money or property, concededly belonging at least in part to another, to join in a single suit two or more persons asserting mutually exclusive claims to the fund."  *White v. Fed. Deposit Ins. Corp.*, 19 F.3d 249, 251 (5th Cir. 1994).   Interpleader actions are remedial in nature, so the governing rules and statutes are to be liberally construed.  *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533 (1967).   There are two approaches to interpleader in federal courts, commonly referred to as "rule interpleader" and "statutory interpleader."   Rule interpleader is brought pursuant to Federal Rule of Civil Procedure 22, while statutory interpleader is brought pursuant to the Federal Interpleader Act, codified at 28 U.S.C. §§ 1335, 1397, 2361.   The primary distinction between the two types of interpleader is that "unlike the interpleader statute which grants district courts original jurisdiction, the interpleader rule is merely a procedural device and does not grant this Court subject matter jurisdiction."  *Sun Life Assur. Co. of Canada v. Thomas*, 735 F. Supp. 730, 732 (W.D. Mich. 1990) (citing *Bell & Beckwith v. United States*, 766 F.2d 910, 914 (6th Cir. 1985)).   Accordingly, "[i]n an action brought pursuant to the interpleader rule, either federal question jurisdiction or diversity jurisdiction must be established."  *Id*.

Here, diversity jurisdiction is pleaded and unchallenged.  *See* D.E. 13 at 2.  The parties agree that this interpleader action is brought under Rule 22.  *See* D.E. 44 at 4; D.E. 46 at 2-3.

Statutory interpleader would not be available here because the Defendants are not diverse—they are both citizens of Kentucky.  *See* 28 U.S.C. § 1335(a)(1).

When the Court decides that interpleader is available, "it may issue an order discharging the stakeholder, if the stakeholder is disinterested, enjoining the parties from prosecuting any other proceeding related to the same subject matter, and directing the claimants to interplead." *United States v. High Tech. Prod., Inc.*, 497 F.3d 637, 641 (6th Cir. 2007) (quoting 7 Fed. Prac. & Proc. Civ. § 1714 (3d ed.)).  "The primary test for determining the propriety of interpleading the adverse claimants and discharging the stakeholder is whether the stakeholder legitimately fears multiple vexation directed against a single fund or property."  *Id.* at 642 (quoting 7 Fed. Prac. & Proc. Civ. § 1704 (3d ed.)) (alterations omitted).

Here, it is undisputed that NY Life "is or may be exposed to multiple liability" in light of Defendants' competing claims to the policy proceeds.  D.E. 13 at 3.  In fact, Wife opposes the injunction in order to maintain an avenue to sue in light of the Court's future rulings.  D.E. 46 at 2-3.  This is a classic interpleader action, and as such Defendants should be enjoined "from prosecuting any other proceeding related to the same subject matter."  *High Tech*, 497 F.3d at 641 (quoting 7 Fed. Prac. & Proc. Civ. § 1714 (3d ed.)); *see also Companion Prop. & Cas. Ins. Co. v. Boden*, No. 3:12-CV-593-CRS, 2012 WL 6488751, at *4 (W.D. Ky. Dec. 13, 2012) (explaining that an injunction is appropriate when an insurer is faced with "conflicting but mutually explosive claims to a policy" (quoting *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533 n. 15 (1967))).

### C.  Attorneys' Fees and Expenses

NY Life's Second Amended Complaint asks the Court to "award[] the Company its attorneys' fees and costs in their entirety."  D.E. 13 at 4.  Defendants object, and argue that NY

Life's costs associated with this suit are "simply part of the cost of doing business."  D.E. 45 at 3; *see also* D.E. 46 at 5.  Sister argues that Wife should be held responsible for NY Life's attorneys' fees and costs.  D.E. 45 at 3-4.

The Sixth Circuit has explained:

> Neither Rule 22 nor the interpleader statute contains an express reference to costs or attorney's fees.  Nevertheless, a federal court has discretion to award costs and counsel fees to the stakeholder in an interpleader action, whether brought under Rule 22 or the interpleader statute, whenever it is fair and equitable to do so.  An interpleading party is entitled to recover costs and attorney's fees when it is (1) a disinterested stakeholder, (2) who has conceded liability, (3) has deposited the disputed funds into court, and (4) has sought a discharge from liability.  The only limiting principle is reasonableness, and it is at the discretion of the Court to determine what award is appropriate.

*Holmes v. Artists Rights Enf't Corp. (AREC)*, 148 F. App'x 252, 259 (6th Cir. 2005) (quotation marks and citations omitted).

Thus, the general rule is that "[a] party properly invoking interpleader is entitled to reasonable attorney's fees and costs."  *Am. Gen. Life Ins. Co. v. Estate of Cook*, No. 3:08-CV-204-TBR, 2009 WL 2447937, at *1 (W.D. Ky. Aug. 7, 2009) (citing *Mutual Life Ins. Co. of New York v. Bondurant*, 27 F.2d 464, 465 (6th Cir. 1928)).

But there are exceptions to this rule.  "[C]ourts are reluctant to award fees in cases where the claims are of the type that arise in the ordinary course of the stakeholder's business," such as in cases involving life insurance proceeds.  *Sun Life Assur. Co. of Canada v. Thomas*, 735 F. Supp. 730, 733 (W.D. Mich. 1990) (citing *Companion Life Ins. Co. v. Schaffer*, 442 F. Supp. 826, 830 (S.D.N.Y. 1977)); *see also Cook*, 2009 WL 2447937, at *1 (denying attorneys' fees when "[t]he filing of the interpleader action provided legal certainty to Plaintiff and was simply part of the cost of doing business.").

11

Courts have relied upon three theories to exclude insurance companies from the general rule. First, courts have reasoned that insurance companies should not be compensated simply because conflicting claims have arisen during the normal course of business. *Unum Life Ins. Co. of American v. Kelling*, 170 F. Supp. 2d 792, 794 (M.D. Tenn. 2001) (citing *Sun Life Assurance Co. of Canada v. Thomas*, 735 F. Supp. 730, 732 (W.D. Mich. 1990) (declining to award attorney fees because "conflicting claims to benefits owed by beneficiaries . . . are inevitable")). Second, courts have denied attorney fees because insurance companies are necessarily interested stakeholders, as filing the interpleader action ensures that the company will not incur further liability under the contested policy. *Kelling*, 170 F. Supp. 2d at 794-95. Finally, courts have relied upon the policy argument that awarding attorney fees "would senselessly deplete the fund that is the subject of preservation through interpleader." *Id.* at 795 (citations omitted).

*USAA Life Ins. Co. v. Space*, No. 3:14-CV-661-TBR, 2015 WL 3407323, at *5 (W.D. Ky. May 26, 2015).

Although this action fits within the general rule (and the four-factor test described in *Holmes*), this is an insurance case like *Space* and *Cook*, in which the claim arose during the normal course of business. Further, NY Life is being granted the legal benefits of interpleader and a permanent injunction. Accordingly, equity weighs in favor of each party bearing its own fees and costs. Although NY Life argues that Wife's refusal to enter an agreed order for interpleader forced the company to bear additional costs (D.E. 49 at 3), this fact does not tip the equitable scales against excluding insurance companies from the general rule. NY Life's request for attorneys' fees will be denied.

### III.  Defendants' Cross-Motions for Summary Judgment

Once NY Life deposits the insurance proceeds plus interest, who should get them, the named beneficiary (Sister) or Wife, who paid the premiums? The Court begins with the baseline rule under Kentucky law that an insured's right to change the beneficiary is "absolute" unless equities intervene and overpower that right. *Bays v. Kiphart*, 486 S.W.3d 283, 291 (Ky. 2016).

12

Wife presents several arguments, but only one has much merit:  she "is equitably entitled to the proceeds because payment of the proceeds to [Sister] would constitute unjust enrichment."  D.E. 64.

### A.

Wife's other claims can be disposed of quickly.

In Count I of her cross-claim, Wife claims she had a "vested interest" in the policy proceeds as the one who paid the premiums and was previously named as beneficiary.  D.E. 9 at 6.  However, under Kentucky law, "A life-insurance beneficiary has only a contingent interest in the benefits of the policy, and where the insured retains the right to change the beneficiary, that right is virtually absolute."  *Bays*, 486 S.W.3d at 291.

> "[A life insurance policy] is nothing more nor less than a contract wherein an insurance company, for valuable consideration, agrees to pay a sum of money on a specified contingency to a designated person called a beneficiary."  . . .  [T]he insured has exclusive authority to designate whomever he chooses as beneficiary and to change his designation without limitation during his lifetime.

*Hughes v. Scholl*, 900 S.W.2d 606, 607 (Ky. 1995) (quoting *Ping v. Denton*, 562 S.W.2d 314, 316 (Ky. 1978)).  "A named beneficiary acquires no right other than a defeasible vested interest, a mere expectancy."  *Davis v. Davis*, 775 S.W.2d 942, 944 (Ky. Ct. App. 1989).  Accordingly, Wife possessed only a contingent interest until Terry made the beneficiary change, not a vested one.[2]

In Count II of her cross-claim, Wife claims that the beneficiary change was a "dissipation of marital assets" in violation of Kentucky law.  D.E. 9 at 6.  However, under Kentucky law, the

---

[2] Wife clarifies in her later filings that she believes her interest is "vested" as an equitable matter by virtue of her agreement with Terry.  D.E. 55 at 13-16.  This argument is therefore subsumed by her unjust enrichment claim.

proceeds of a life insurance policy are not marital property because they are not acquired until after the death of the spouse, *i.e.*, after the end of the marriage. *Davis*, 775 S.W.2d at 944.

In Count IV of her cross-claim, Wife claims that Terry, at the time he made the beneficiary change, "lacked the capacity" to do so. D.E. 9 at 8. She alleges that Terry "was taking numerous medications for pain and various physical ailments," several of which "have powerful neurological effects and are capable of impairing judgment[.]" *Id.* at 4-5. She also alleges that Terry "frequently consumed alcohol to excess." *Id.* at 5. However, in a memorandum, Wife "concedes that investigation and discovery have not produced sufficient evidence to pursue her claim that Tim Terry lacked capacity to execute the beneficiary change[.]" D.E. 55[3] at 8.

In Count V of her cross-claim, Wife claims that Sister had exerted "undue influence" on Terry. D.E. 9 at 8. In a memorandum, Wife "concedes that there is no direct evidence that [Sister] unduly influenced her brother to change the beneficiary." D.E. 55 at 20. However, she argues that circumstantial evidence supports a reasonable inference that the "badges of undue influence" are present.[4] *Id.* Accordingly, her position is that "a genuine issue of material fact" exists on the undue influence question, so the Court should deny Sister's motion for summary judgment. D.E. 55 at 22; *see also* D.E. 64 at 10 n.2.

---

[3] Docket Entries 55 and 58-1 are identical.

[4] In the context of a will, the Kentucky Supreme Court has explained:

> Such badges include a physically weak and mentally impaired testator, a will which is unnatural in its provisions, a recently developed and comparatively short period of close relationship between the testator and principal beneficiary, participation by the principal beneficiary in the preparation of the will, possession of the will by the principal beneficiary after it was reduced to writing, efforts by the principal beneficiary to restrict contacts between the testator and the natural objects of his bounty, and absolute control of testator's business affairs.

*Bye v. Mattingly*, 975 S.W.2d 451, 457 (Ky. 1998).

14

On the contrary, the seven "badges" to which Wife points (D.E. 55 at 21) do not implicate any genuine issue of material fact. The facts needed to assess undue influence are not debated at this point. The only exception might be Wife's argument that, "[although] Tim had sufficient capacity to execute the [beneficiary] change, he was obviously disturbed, as shown by the fact that he committed suicide just four days later, meaning that he may have been more susceptible to influence by his sister." *Id*. But even assuming that Terry's overdose death was intentional, an allegation that an insured was "more susceptible to influence" is simply an argument that the opportunity for undue influence existed.

Sister (D.E. 47-1 at 10-11) points out that, under Kentucky law, "mere opportunity for undue influence is not sufficient. It must appear that such influence was exercised." *Smith v. Gilligan's Adm'r*, 124 S.W.2d 798, 806 (1939) (quoting *Smith v. Smith*, 47 S.W.2d 1036, 1040 (1932)).

> [I]t is the settled rule that when a donor, testator, or grantor is shown to be mentally competent to dispose of his property and nothing more is shown than that the beneficiaries had a mere opportunity to exercise influence, such influence will not be presumed because of age or physical infirmities. In such circumstances there must be evidence of a substantive and probative nature tending to show that the beneficiaries actually exercised undue influence.

*Id*. at 805.

Here, there is no evidence that Sister exercised *any* influence over Terry regarding the beneficiary change. Caudill, the insurance agent, testified that Terry made the decision in his presence during the office visit, after he informed him of his right to change the beneficiary. D.E. 52 at 21. Sister testified that she never asked Terry to change the policy, and that she did not know about the change until after his death. D.E. 51 at 29. Caudill also had the impression that sister was surprised by the news. D.E. 52 at 29. The evidence that Terry was susceptible to

influence is also weak because Caudill considered Terry "lucid" and "on top of his game" during their meeting. *Id*. at 16. Caudill testified that Terry made the change because he felt betrayed by Wife and grateful toward Sister. *Id*. at 15, 20, 26. Terry did not appear to be under pressure from anyone else to make the beneficiary change. *Id*. at 25-26.

Wife has presented no "substantive and probative evidence" of the actual exercise of undue influence. *Smith*, 124 S.W.2d at 805. Even assuming Terry was distressed, depressed, and heavily medicated on September 1, 2015, these allegations amount to a "mere opportunity" for Sister to wield undue influence. And no evidence indicates Sister pursued that opportunity. Thus, Wife's argument—that the evidence supports a reasonable inference that Sister exercised undue influence—is not correct.

**B.**

What remains is Wife's central argument that she "is equitably entitled to the proceeds because payment of the proceeds to [Sister] would constitute unjust enrichment." D.E. 64. "For a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009).

A couple of preliminary matters need addressing. First, Sister argues that Wife's claim is properly a breach of contract action against Terry's estate. D.E. 47-1 at 5. But the Court must consider the merits of the claim presented here. Second, Sister argues that Wife has not pleaded the elements of an unjust enrichment claim because any benefit to Sister was conferred at Terry's expense, not Wife's expense. D.E. 47-1 at 7-8. This is hair splitting. The insurance proceeds

are certainly a benefit, and for Wife to lose her benefit as beneficiary was certainly, from her perspective, a change at her expense.

In her cross-claim, Wife claims that giving the money to Sister would be inequitable because (1) Wife had an express agreement with Terry that she would be the beneficiary; (2) she paid all the premiums; (3) the policy was a marital asset; and (4) her lawyers relied on Terry's lawyer's representation that he had instructed Terry not to change the policy. D.E. 9 at 7. The Court understands that Wife is disappointed by Terry's decision to remove her as beneficiary. But her arguments are not brawny enough to budge Terry's baseline right to change the beneficiary at will. Stated differently, she has not created a genuine issue of material fact that Sister would be unjustly enriched if she takes the proceeds.[5]

## 1.

Wife's first and most well-developed argument is that her agreement (oral contract) with her husband should drive the equities analysis. D.E. 9 at 7; D.E. 55 at 11. The Court will assume for its present purposes that no evidentiary issues would prevent Wife from proving the existence and contents of the agreement. Wife states in her affidavit, "After Tim left his job at Dick's Sporting Goods, he lost his group life insurance coverage, so we wished to purchase a policy on his life to provide additional security for me and our two sons in the event of his death." D.E. 58-2 at 1. However, her deposition testimony was more precise, and established that the agreement existed solely for the benefit of the children.

> Wife:   We discussed getting life insurance, . . . discussed that I would be the beneficiary. This was done to be set up for our children, who were young at that age, elementary and junior high age. This was something for them. And I would be named beneficiary for them.

---

[5] Importantly, Wife relies on authority (D.E. 55 at 12) that holds "The evidence required to establish a constructive trust must be clear and convincing." *Rose v. Ackerson*, 374 S.W.3d 339, 344 (Ky. Ct. App. 2012) (citing *Keeney v. Keeney*, 223 S.W.3d 843, 850 (Ky. Ct. App. 2007)); *see also* D.E. 64 at 8.

. . . .

Q:      . . . What was your agreement with Tim Terry?

A:      That the life insurance policy would be drawn and I would be the beneficiary.  But the policy—in the time—if anything happened to him, this money would be for his children and his children only.

Q:      Okay.  Anything else in the agreement?

A:      And that I would pay for the policy myself out of my income.

D.E. 54 at 18-19.  She further testified:

Q:      If Mr. Terry had no income, the fact of the matter is, you were going to pay the policy premiums if you wanted a policy; isn't that correct?

Wife:   I paid the policy, because the policy was for our children.

Q:      It wasn't for you?

A:      It wasn't for me.  No.  The beneficiary was—I was the beneficiary, but this was something for our children.

Q:      Well, the point that I'm making, though, is, isn't it true that you paid the premiums because you wanted the policy for your children?

A:      Because he wanted the policy for his children.

Q:      Well, you wanted the policy for your children, too; didn't you?

A:      We both wanted the policy for our children.

Two important points torpedo Wife's equity argument.  First, for the nearly ten years that she paid the premiums, Wife (and her sons in turn) enjoyed the benefit of her contingent interest in the policy proceeds.  Had Terry passed away, Wife would have been the beneficiary.  The fact that she enjoyed this benefit up until September 1, 2015, takes much of the steam out of her argument that her reliance on the oral contract makes honoring the beneficiary change inequitable.

18

The second point is that, based on Wife's description of the agreement, the actual intended beneficiaries were only the children. According to her deposition, when she made the agreement, Wife had no expectation that she would personally benefit from the life insurance policy. "This money would be for his children and his children only." D.E. 54 at 19.

Although they were minors at that time, Terry and Wife's sons are now approximately 24 and 26 years old. D.E. 58-2 at 1. They are adults, and they are not parties to this action. If Wife wishes to effectively enforce the contract—on its own terms—on equitable grounds, the Court is unable to do so. The Court cannot ensure that the life insurance proceeds reach the sons because they are not before the Court. In other words, the Court is powerless to effectuate the original intent of Wife and Terry. Instead, Wife currently seeks payment of the proceeds to herself. D.E. 9 at 9. The fact that Wife is attempting to secure the proceeds for herself instead of expressly for the benefit of the sons further diminishes the strength of her argument that the existence and terms of the contract tip the equities in her favor.

Sister makes an additional point that diminishes the importance of the contract in the balance of equities. She argues that the contract between Wife and Terry was legally terminable at will by either party because it had no expiration date. D.E. 61 at 3-5. "The rule in this state is that if a contract covers no definite period, it may be terminated by either party at will." *Elec. & Water Plant Bd. of City of Frankfort, Kentucky v. S. Cent. Bell Tel. Co.*, 805 S.W.2d 141, 143 (Ky. Ct. App. 1990) (citing *Brownsboro Rd. Rest., Inc. v. Jerrico, Inc.*, 674 S.W.2d 40, 41 (Ky. Ct. App. 1984)). Wife presents no evidence that the contract was intended to cover a definite time period. *See Brown v. Outback Steakhouse*, No. 5:14-CV-372-JMH, 2016 WL 590218, at *2 (E.D. Ky. Feb. 11, 2016). Therefore, the contract was terminable at will by either party. According to Sister, either Wife constructively terminated the contract by filing for divorce and

directing Terry to move out of the house, or Terry terminated the contract by the time he changed the automatic withdrawal and made the beneficiary change.  D.E. 61 at 4-6.  This appears correct:  the contract was terminable at will, and it was terminated at the very latest by Terry on September 1, 2015.  Accordingly, the fact that the contract was terminated before Terry died further lessens the impact of Wife's expectancy on the equitable calculus.

Wife challenges this conclusion, arguing that the agreement "was not unilaterally terminable by Tim Terry."  D.E. 64 at 1.  She makes two arguments.  First, Wife argues that "Kentucky's terminable-at-will rule is moderated by a requirement that the terminating party provide reasonable notice of termination."  *Id*. at 2 (quoting *MidAmerican Distribution, Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 678 (E.D. Ky. 2011), *aff'd*, 485 F. App'x 779 (6th Cir. 2012)).  *MidAmerican* involved a contract action between companies involved in manufacturing and distributing equipment in the food service industry.  *Id*. at 649.  "Reasonable notice is that period of time which, under the circumstances of the case, would allow one to make alternate arrangements upon cessation of the contract and minimize losses."  *Pharo Distrib. Co. v. Stahl*, 782 S.W.2d 635, 638 (Ky. Ct. App. 1989).  The "obvious object of the reasonable notice requirement" is "to afford the party losing the contract an opportunity to make appropriate arrangement in lieu thereof by dispersing inventory, adjusting work force, exploring probable alternatives, and in general, 'getting his house in order' to proceed in absence of the former relationship."  *Id*.  In such circumstances, termination of the contract is not breach, rather "it is the failure to give reasonable notice before termination that constitutes breach."  *Id*.

Wife argues that because Terry "secretly" terminated their agreement, he breached it, thus tipping equity in her favor.  The Court is not convinced.  First, Wife has provided no authority that this "reasonable notice" rule applies to terminable-at-will contracts outside the

20

business context.  If the rule's "obvious object" is to allow the other party to, *i.e.*, disperse inventory and adjust its work force, it does not necessarily follow that the rule applies in the context of an agreement between two spouses regarding an otherwise revocable beneficiary designation.

Second, although the Court does not in any way fault Wife for seeking a divorce, it appears that in doing so she breached the 2006 agreement or at least acted in a manner inconsistent with the agreement.  As Wife explains in her affidavit,

> With regard to purchasing the insurance policy, Tim and I agreed that he would stay at home with our two sons, I would continue to work, and the premiums on a new life insurance policy on his life would be paid from my income through our joint checking account at Community Trust Bank.  We also agreed that because our sons were only 13 and 16 years old at the time, I would be the named beneficiary.

D.E. 58-2 at 2.  If part of the agreement was that Terry would stay at home with the sons, then Wife breached this provision when she filed for divorce, asked Terry to leave the house, and obtained a Court order that he not enter the property "other than by prior written agreement of the parties, through counsel."  D.E. 58-4 at 4-5.  Clearly, Terry was unable to "stay home" at this point.

Third, Wife's behavior during the divorce proceedings shows that she had notice the agreement had ended.  *See MidAmerican*, 807 F. Supp. 2d at 679 (finding no breach under the reasonable notice rule when the plaintiff was aware of the "possibility of termination").  She told her lawyers that the policy was Terry's only substantial asset and that Terry "might cash out the policy."  D.E. 58-4 at 2; D.E. 58-5 at 2.  This behavior shows Wife was aware of the possible beneficiary designation change, so the purpose of providing notice was already accomplished.

Wife's second argument regarding the terminable-at-will contract is that "where a contract has been fully performed by one party it cannot be terminated by the other." D.E. 64 at 2 (quoting *Bus. Men's Assur. Co. of Am. v. Eades*, 161 S.W.2d 920, 922 (Ky. Ct. App. 1942)). The point of this quotation in the *Eades* case is that because Eades had performed under the contract, the company could not thereafter cancel the contract and refuse to pay him. If party A performs the contractual service, party B needs to pay up. The case at hand is readily distinguishable because the benefit Wife received in exchange for paying the premiums was a contingent interest in life insurance proceeds that were themselves intended for the benefit of the children. For the nearly ten years that Wife was the named beneficiary, she enjoyed that benefit, and both sides performed their contractual obligations.

## 2.

Wife's second argument is that the equities tip in her favor because she paid all the policy premiums from May 2006 through August 2015. D.E. 9 at 7. At $422.50 per month,[6] Wife paid roughly $47,000 in premiums. Although Terry changed the automatic bank draft so that the premiums would come from his new separate bank account, he died before the first withdrawal materialized. D.E. 55 at 7. Again, while this argument has initial intuitive appeal, the fact remains that Wife enjoyed the contingent status of beneficiary through almost the entire life of the policy. Had Terry died any time between May 31, 2006, and September 1, 2015, Wife would have received the policy proceeds. The nature of an insurance beneficiary is that she possesses "no right other than a defeasible vested interest, a mere expectancy." *Davis v. Davis*, 775 S.W.2d 942, 944 (Ky. Ct. App. 1989). Wife's payment of all the premiums does not render the beneficiary change invalid. It also bears repeating that, according to Wife's deposition

---

[6] This was the amount of the premiums at the time of Terry's death. D.E. 54 at 15. The Court assumes it remained steady over the life of the policy.

testimony, her expectancy was an expectancy for the benefit of her children—individuals who are now grown and are not before the Court.

In her reply brief, Wife makes an additional argument that Kentucky law has "recognized an exception to the usual treatment of assets after divorce where insurance premiums were paid by the other spouse."  D.E. 64 at 8 (citing *Bissell v. Gentry*, 403 S.W.2d 15, 16 (Ky. 1966)). Wife provides a partial quote from *Bissell* to this effect, but the context of the *Bissell* opinion makes clear that the Court is espousing this rule "squarely within the restoration provision of KRS 403.060," a statute pertaining to the disposition of marital property that was repealed in 1972.[7]  *See Ping v. Denton*, 562 S.W.2d 314, 316 (Ky. 1978) (discussing the repeal of § 403.060, and how the "1972 session of the General Assembly made major changes in our statutes dealing with family law").  The point of this passage in *Bissell* is that under the law at the time, divorce generally *extinguished* a spouse's status as life insurance beneficiary, *except* in cases where the surviving spouse paid the premiums.  *Bissell* is not on-point.

### 3.

Wife's third argument is that the policy was essentially a marital asset, so it would be inequitable to let the proceeds pass to Sister.  D.E. 9 at 7.  Wife nowhere mentions this argument in her memorandum in support of summary judgment, so it appears abandoned.  D.E. 55.  In any event, the proceeds of a life insurance policy are not marital property because they are not

---

[7] The full paragraph states:

> This court has held consistently that the interest of a spouse as beneficiary comes squarely within the restoration provision of KRS 403.060, and as a result, every right of a divorced party as beneficiary of a policy of life insurance on the life of the other is extinguished, except in cases where the policy on the life of one of the parties is obtained during the marriage and the other pays the premiums during the marriage. In such case he or she is entitled to continue payments and receive the proceeds of the policy upon maturity.

*Bissell*, 403 S.W.2d at 16.

acquired until after the death of the spouse.  *Davis*, 775 S.W.2d at 944.  This argument does not move the needle of equity in Wife's direction.

**4.**

Wife's fourth argument is that her lawyers relied on Terry's lawyer's representation that he had instructed Terry not to change the policy.  D.E. 9 at 7.  Terry insists that she could have easily obtained a "Status Quo Order" that would have required Terry not to change the beneficiary.  D.E. 55 at 4.  However, no such order was entered.  D.E. 62 at 15.  Instead, according to Terry, her lawyers relied on the operation of local custom among family law attorneys and Terry's attorney's representation that he had followed that custom and counseled Terry not to do anything that would change his financial status quo vis a vie Wife.  D.E. 64 at 9.

This argument is similar to the one involving the previously-discussed agreement between Terry and Wife, although here the alleged agreement (that Terry would not change the policy) was between Wife's and Terry's lawyers—their agents.  Wife appears to argue that Terry's agent entered an agreement (either a contract or perhaps an implied Status Quo Order) that Terry would leave untouched all his assets, including the policy.  Because Terry's beneficiary change violated this agreement or constructive order, it would be inequitable to effectuate the change.  D.E. 55 at 18.

Even assuming that Terry's lawyer instructed him not to change the beneficiary,[8] the fact that Terry acted against his lawyer's advice does not mean it is inequitable for Sister to receive the policy proceeds.  This Court is not in a position to enter a retroactive Status Quo Order when the parties chose not to pursue one.  Again, the question is whether it is so grievously unfair to

---

[8] Terry's lawyer Rowland testified that he could not recall whether he specifically told Terry not to change the beneficiary.  D.E. 53 at 26.  He said that the concern at the time was that Terry might "cash it out."  *Id*. at 27.  Rowland testified that changing the beneficiary "wasn't really on [his] radar."  *Id*.

allow Sister to remain the beneficiary that it overpowers Terry's otherwise absolute right to change the beneficiary.  Although the behavior of the lawyers may have contributed to Wife's surprise and dismay at the policy change, this does not create a compelling equitable issue under the elements of an unjust enrichment claim.

Accordingly, the equitable considerations in this case are not so weighty as to overturn Terry's generally absolute right to change the beneficiary of his life insurance.  For Sister to receive these funds is not so unjust as to require Court intervention.  Although Wife paid the proceeds and expected to be the beneficiary, she had the benefit of a contingent interest in the policy proceeds for many years.  At the crucial moment, Terry felt betrayed by Wife and grateful for Sister, who had "always been there for me and took me in."  D.E. 52 at 20.  And no evidence suggests that Terry's decision-making was impaired or that Sister did anything untoward to secure the beneficiary designation.  The facts are not disputed and this is not the sort of scenario where the Court's equity power must spring into action to forestall a gross injustice.

### C.

Wife and Sister have served up numerous authorities they believe support their claims. But none are sufficiently analogous to control the outcome of this case.

Wife is correct that the Kentucky Supreme Court found that equity could control the outcome in a recent case involving life insurance proceeds.  D.E. 55 at 9 (citing *Davis v. Davis*, 489 S.W.3d 225 (Ky. 2016), *reh'g denied* (June 16, 2016)).  In that case, a husband and his first wife divorced and entered a property settlement agreement which provided that the husband "agrees to maintain his policy of life insurance . . . and will keep [the wife] as the beneficiary." *Davis*, 489 S.W.3d at 226.  That settlement agreement was not properly filed.  The husband remarried, changed the beneficiary to his second wife, and died six weeks after making the

beneficiary change. *Id*. The Kentucky Supreme Court held that the wife could bring a contract claim against the husband's estate to enforce the settlement agreement, despite the fact that the agreement was not properly filed. *Id*. at 229. The Court further stated that the first wife could bring an unjust enrichment claim for a constructive trust against the second wife, provided that she could prove a "confidential relationship" between them. *Id*. at 229-30. Accordingly, the case was remanded for further proceedings. *Id*. at 230. *Davis* is not persuasive or controlling; it merely establishes that a former beneficiary is not foreclosed from bringing an equitable claim against the new beneficiary after the death of the policyholder.

Wife relies on Restatement (Third) of Restitution and Unjust Enrichment § 48 (2011), which states: "If a third person makes a payment to the defendant to which (as between claimant and defendant) the claimant has a better legal or equitable right, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." Wife argues that Illustration 6 to Comment b "applies almost exactly to this case." D.E. 55 at 12. Illustration 6 states:

> Husband agrees with Wife that he will insure his life for her benefit if she pays the premiums. The policy is issued to Husband as owner, naming Wife as beneficiary. Husband thereafter designates his Sister as beneficiary in place of Wife, keeping the status of the policy a secret; Wife continues to pay premiums as they come due. On Husband's death, the policy proceeds are paid to Sister. Husband's estate has no assets from which Wife's contract claim might be satisfied. Wife is entitled by the rule of this section to recover the policy proceeds from Sister.

Restatement (Third) of Restitution and Unjust Enrichment § 48 cmt. b (2011).

The introductory Text of Comment b makes clear that Illustration 6 is an example of a "payment induced by . . . fraud." In this case, there is no allegation of fraud. Further, there are two key differences between this case and the Illustration 6 scenario. Here, Terry did not agree

to "insure his life for [Wife's] benefit."  Instead, as Wife made clear in her deposition, the policy was intended for their children's benefit.  *See supra* Section III.B.1.  Second, in this case, Wife did not continue to pay premiums after the beneficiary change.  Instead, Terry ensured that future payments would come from his account.

Wife points to Kentucky cases "in which equitable rights to assets have been recognized as superior to contractual or other legal rights."  D.E. 55 at 12.  In *Rose* (*id.*), the beneficiary of an annuity reneged on a promise to use the annuity proceeds to pay the annuity owner's debts after his death.  *Rose v. Ackerson*, 374 S.W.3d 339, 342 (Ky. Ct. App. 2012).  The Court found unjust enrichment and imposed a constructive trust due to fraudulent inducement.  *Id*. at 343.  Unlike the beneficiary in *Rose*, Sister here did not defraud anyone.

The case of *Keeney* (D.E. 55 at 12) involved legal title to real estate.  *Keeney v. Keeney*, 223 S.W.3d 843 (Ky. Ct. App. 2007).  The wife, in divorce proceedings, alleged that although the husband had titled the property in his parents' names, it was actually marital property.  *Id*. at 848.  The court imposed a constructive trust under the rule that such a trust may be established "where the legal title to property is obtained through fraud, misrepresentation, concealment, undue influence or taking advantage of one's weakness or necessities, **or through similar means or circumstances rendering it unconscionable for the holder of the legal title to retain the property.**"  *Id*. at 849 (quoting *Fresh v. Dunakin*, 206 S.W.2d 203, 205 (1947)).  Unlike the parents in *Keeney*, here there is no evidence Sister participated in circumstances "similar" to anything like fraud or undue influence.  This is not a case in which the beneficiary "may not in good conscience retain the beneficial interest[.]"  *Id*.

In *McPhail* (D.E. 55 at 13), the federal district court found that the decedent's children by his first marriage had a superior claim to his life insurance proceeds over his second wife.

27

*McPhail v. John Hancock Mut. Life Ins. Co.*, 108 F. Supp. 902 (W.D. Ky. 1952).  Upon their divorce, decedent and his first wife made an oral marital dissolution agreement whereby the policy was to be paid to their minor children.  *Id*. at 903-04.  Decedent later changed the policy beneficiary to his second wife.  *Id*. at 904.  The children, still minors, intervened in the lawsuit through a guardian.  *Id*. at 904-05.  Relying on its equitable powers, the court granted the proceeds to the children's guardian on the basis of a superior equitable assignment of the beneficial interest.  *Id*. at 906.  Here, of course, the children are adults and are not before the Court.

Wife also relies on cases from other jurisdictions.  In *Jenkins* (D.E. 55 at 14), after the husband and wife divorced, they made an agreement in writing that she would continue paying the life insurance premiums in exchange for being the beneficiary.  *Jenkins v. Lovelady*, 273 So. 2d 189, 191 (Ala. 1973).  Shortly before his death, the husband changed the beneficiary to his sister.  *Id*. at 193.  The Court found that, although the ex-wife had no vested interest under the policy, she did have a vested interest under the contract that was superior to the husband's right to change the beneficiary.  *Id*. at 194.  Here, no vested interest has been established by Wife.

In *Johnson* (D.E. 55 at 14), the Illinois appellate court reversed the trial court's decision to dismiss for failure to state a claim.  *Johnson v. N. Am. Life & Cas. Co.*, 241 N.E.2d 332 (Ill. App. Ct. 1968).  In that case, the husband changed the beneficiary from his wife to his children without wife's consent.  *Id*. at 334.  However, the wife argued that she had a contract with the husband that she was to remain the beneficiary in consideration of her significant financial obligations as co-signer of a promissory note.  *Id*. at 334, 336.  The court merely found that the facts as pleaded established the possibility of recovery, and remanded the case.  *Id*. at 336.  This case is clearly neither persuasive or controlling.

In *Katzman* (D.E. 55 at 15), the high court of New York court remanded the case after finding that the husband/insured had perpetrated a "fraud upon his wife" by surreptitiously changing the beneficiary to his sister. *Katzman v. Aetna Life Ins. Co.*, 128 N.E.2d 307, 311 (N.Y. 1955). The wife, who was the breadwinner, made an agreement with her husband in May 1944 whereby she would pay life insurance premiums in exchange for being the beneficiary. *Id.* at 308. In December 1950, the husband allegedly conspired with his sister to make her the beneficiary without informing the wife, who kept paying the premiums until the husband's death in July 1953. *Id.* In that case, the court found the sister may have been "a wrongdoer," and thus should be declared a "trustee ex meleficio." *Id.* at 309. This is clearly distinguishable from the present case, in which Sister was surprised to learn she was made the beneficiary and Wife did not continue paying proceeds after the change. In any event, the legal issue in *Katzman* was the applicability of New York's statute of frauds. *Id.* at 308.

In short, although these authorities are relevant in the sense that they address the general principles involved in this case, none of them is controlling, and each is distinguishable. The Court has focused on the undisputed facts of this case. No material fact is subject to dispute. Sister is entitled to judgment as a matter of law because the equities in this case do not overshadow Terry's right to change the beneficiary of his life insurance from Wife to Sister.

## IV.

The analysis above leaves to be determined the applicable interest rate set by NY Life because no evidence in the record establishes the current rate. To finalize the amount to be awarded to Defendant Wuest, further proceedings are necessary.

**IT IS HEREBY ORDERED THAT:**

29

(1)     NY Life's motion for interpleader and dismissal (D.E. 44) is **GRANTED IN PART.**  Defendant Wuest and NY Life **SHALL, within fourteen days** of the date of this Order, **FILE** a joint statement concerning the interest rate set by NY Life if such a rate can be agreed upon between them.  If not, Wuest and NY Life **SHALL** simultaneously file memoranda, with supporting evidence, concerning their position as to the applicable rate.  The Court will then establish the amount to be deposited and finalize the dismissal of NY Life.  Furthermore, Defendants Wuest and Terry are **PERMANENTLY ENJOINED** from bringing any action against NY Life related to Tim Terry's life insurance policy with NY Life, as of the date of this order.  NY Life's motion for award of attorneys' fees and costs is **DENIED.**

(2)     Defendant/Cross-Claimant Eva Nicole Terry Wuest's motion for summary judgment (D.E. 47) is **GRANTED.**

(3)     Defendant/Cross-Claimant Jane-Ann Hunsaker Terry's motion for summary judgment (D.E. 58) is **DENIED.**

(4)     Each party shall bear its own costs and fees.

(5)     In light of this Order, all previously-established pending deadlines and previously-scheduled hearings (including the pretrial filing deadline, the pretrial conference, and the jury trial) are **VACATED.**

This the 10th day of January, 2017.



Signed By:

*Hanly A. Ingram*

United States Magistrate Judge